Patrick J. Schiltz, United States District Judge
Defendant Ryan Manning is charged with possessing, producing, and attempting to produce child pornography. Manning moved to suppress evidence found when law-enforcement officers searched his home pursuant to a search warrant. Manning also moved to suppress statements that he made to law-enforcement officers during the search. This matter is before the Court on Manning's objection to the November 1, 2018 Report and Recommendation ("R&R") of Magistrate Judge David T. Schultz. Judge Schultz recommends denying Manning's motions to suppress. The Court has conducted a de novo review. See 28 U.S.C. § 636(b)(1) ; Fed. R. Civ. P. 72(b). Based on that review, the Court agrees with Judge Schultz that Manning's suppression motions should be denied, although the Court's reasoning differs somewhat from Judge Schultz's. The *843 Court therefore adopts the R&R to the extent that it is consistent with this order.
I. BACKGROUND
The Court will assume familiarity with the R&R, including its description of the facts. See ECF No. 55 [R&R] at ---- - ----, ---- - ----. The challenged search warrant was issued on the basis of an affidavit submitted by Special Agent Dawn Johnson of the Minnesota Bureau of Criminal Apprehension ("BCA"). To briefly summarize the contents of that affidavit:
Omegle is an online social media platform that "randomly pairs users in one-on-one chat sessions where they chat anonymously." ECF No. 33-1 at 5. Through the use of webcams and microphones, Omegle users may both see and speak to each other. ECF No. 33-1 at 5. Omegle users may also use third-party software to "transmit pre-recorded video." ECF No. 33-1 at 5. Omegle "automatically captures snapshots from users' webcam video streams" for moderation teams to review. ECF No. 33-1 at 5. If Omegle moderators spot what appears to be child pornography, they forward the relevant snapshots to a "CyberTipline" run by the National Center for Missing and Exploited Children ("NCMEC"). See ECF No. 33-1 at 4-5. NCMEC analysts "examine and evaluate the content" of CyberTips, add "related information" that might assist law enforcement, and then "provide all information to the appropriate law enforcement agency for investigation." ECF No. 33-1 at 4.
In August 2016, the BCA received a CyberTip from NCMEC involving apparent child pornography flagged by Omegle. ECF No. 33-1 at 4. The CyberTip reported that the snapshots came from a user identified as:
ESP User ID: YS7SG2SLIP Address: 50.188.79.76 (Upload)07-19-2016 00:33:35 UTC
ECF No. 33-1 at 4. The CyberTip included twelve snapshots of a video stream intercepted by Omegle's moderation team. Agent Johnson (who specializes in investigating "crimes against children" and "crimes related to predatory offenders") reviewed all twelve snapshots. ECF No. 33-1 at 4-5. Through further investigation and visual surveillance, Agent Johnson traced the Omegle account to Manning. See ECF No. 33-1 at 4-6.
On December 15, 2016, Agent Johnson applied for a warrant to search Manning's residence, vehicles, and belongings. ECF No. 33-1 at 1-3, 10. As noted, Agent Johnson submitted an affidavit in support of her application. Judge Allen Oleisky issued the warrant the same day. ECF No. 33-1 at 13. The BCA executed the warrant on the following day, ECF No. 55 at ----, and discovered evidence of child pornography. During the search of his home, Manning made several incriminating statements in response to questions asked by Agent Johnson. Manning made those statements after Agent Johnson told him that he was not in custody and not under arrest. Gov't Ex. 1A at 2.[1]
Manning now moves to suppress both the evidence found during the search of his home and the statements that he made to Agent Johnson.
II. ANALYSIS
A. Motion to Suppress Evidence
1. Standard of Review
This Court must give "great deference" to the probable-cause determination *844 made by Judge Oleisky. United States v. Butler , 594 F.3d 955, 962 (8th Cir. 2010) (citation omitted). The Court must uphold Judge Oleisky's determination of probable cause as long as he had a "substantial basis" for concluding that the "search would uncover evidence of wrongdoing." United States v. Horn , 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates , 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ). "When the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.' " United States v. Solomon , 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted).
2. Merits
Manning argues that Agent Johnson's affidavit did not provide probable cause to believe that a search of his residence and belongings would uncover evidence of child pornography. ECF No. 48 at 1, 6-7. The Court disagrees.
"An affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus , 592 F.3d 826, 828 (8th Cir. 2010) (cleaned up). "Determining whether probable cause exists at the time of the search is a 'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.' " United States v. Donnelly , 475 F.3d 946, 954 (8th Cir. 2007) (citation omitted). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." Id. (citation omitted).
Agent Johnson's affidavit provided strong evidence that two Omegle users had participated in a video chat during which child pornography had been transmitted. Agent Johnson described the CyberTip that Omegle sent to NCMEC after discovering that an Omegle user had streamed "apparent child pornography." ECF No. 33-1 at 4. Agent Johnson reviewed all twelve snapshots in the CyberTip and included in her affidavit a description of the snapshot depicting child pornography. See ECF No. 33-1 at 5. Agent Johnson's detailed description of that snapshot was sufficient to establish a fair probability that one Omegle user had transmitted child pornography to another in the course of a video chat. See Mutschelknaus , 592 F.3d at 828-29.
Moreover, Agent Johnson's affidavit provided strong evidence that Manning had been one of the two Omegle users involved in that video chat. As Agent Johnson explained in her affidavit, the CyberTip included an IP address that she traced to Manning's residence. See ECF No. 33-1 at 5-6. The CyberTip also contained eleven snapshots of a man that Agent Johnson "confident[ly]" identified as Manning. ECF No. 33-1 at 5-6. Agent Johnson's affidavit further connected Manning to the Omegle video chat by explaining that the snapshot showing child pornography being livestreamed came from the "same IP address" and the "same webcam" as the eleven snapshots of Manning. ECF No. 33-1 at 5. Taken together, these facts gave Judge Oleisky a substantial basis for concluding not only that Manning had participated in the video chat, but that he had streamed child pornography from his residence. See United States v. Gray , No. 13-CR-0256 (DSD/SER), 2014 WL 1415080, at *2 (D. Minn. Apr. 10, 2014) (finding probable cause where the "affidavit in support of the warrant" detailed the "activities of *845 [the] investigators" and "connected their findings" to the defendant).
The R&R asserted that Agent Johnson had failed to clarify in her affidavit "whether the association of the image to Manning's IP address indicates that he was transmitting the video at issue or merely viewing it." ECF No. 55 at ---- n.2.[2] That is not accurate. As just noted, Agent Johnson provided evidence that child pornography had been streamed from the same webcam and the same IP address as the images of Manning. That makes it fairly clear that Manning was doing the transmitting, and the other user was doing the viewing. In any event, even if Agent Johnson had provided no evidence whatsoever about whether it had been Manning or the other Omegle user who had been doing the transmitting, Judge Oleisky still had probable cause to issue the warrant. Agent Johnson explained in her affidavit that Omegle allows users to video chat "one-on-one." ECF No. 33-1 at 5. Based on that fact, Judge Oleisky knew that either Manning or the other Omegle user had been streaming the child pornography. Even if the evidence pointing to Manning as the transmitter of the child pornography were ignored, Judge Oleisky would nevertheless have known that there was a 50/50 chance that Manning was the Omegle user who had streamed the child pornography. See United States v. Thompson , 210 F.3d 855, 860 (8th Cir. 2000) (allowing judges to draw "reasonable inferences" when determining if "probable cause exists to issue a warrant"). Probable cause exists even when there is less than a 50/50 chance of finding evidence of a crime. See United States v. Carbajal , 449 F. App'x 551, 554 (8th Cir. 2012). Obviously, then, Agent Johnson's affidavit provided probable cause that Manning had streamed the video. See United States v. Garcia , 179 F.3d 265, 269 (5th Cir. 1999) ("[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark.").[3]
Manning next argues that the evidence in Agent Johnson's affidavit did not support a finding of probable cause because it was stale, given that at least five months (and perhaps much longer) had elapsed between the Omegle chat and the application for the warrant. "A warrant *846 becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.' " United States v. Brewer , 588 F.3d 1165, 1173 (8th Cir. 2009) (citation omitted). Staleness depends on "the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." United States v. Estey , 595 F.3d 836, 840 (8th Cir. 2010) (citation omitted).
Agent Johnson's affidavit noted that the CyberTip was dated July 19, 2016 and had been transmitted from NCMEC to the BCA in August 2016. But neither Agent Johnson nor the CyberTip itself clarified whether July 19, 2016 was the date of the video chat, the date when the Omegle team reviewed the snapshots of the video chat, the date when Omegle transmitted the CyberTip to NCMEC, or some other date. And thus, as Manning argues, Judge Oleisky could not have known precisely how much time had elapsed between the video chat and the search-warrant application.
The Court does not believe that, under Eighth Circuit precedents, the absence of this information meant that Agent Johnson's affidavit failed to establish probable cause. Child pornography cases are unique. Knowing that a person possessed illegal drugs several months ago may not (in and of itself) provide probable cause to believe that the same person possesses illegal drugs today, as those who possess illegal drugs typically use or sell them promptly. See United States v. Kennedy , 427 F.3d 1136, 1142 (8th Cir. 2005) ("[I]nformation of an unknown and undetermined vintage relaying the location of mobile, easily concealed, readily consumable, and highly incriminating narcotics could quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation."). But knowing that a person possessed child pornography several months ago generally does (in and of itself) provide probable cause to believe that the same person possesses child pornography today, given the "compulsive nature of the crime ... and the well-established hoarding habits of child pornography collectors[.]" United States v. Notman , 831 F.3d 1084, 1088 (8th Cir. 2016).
Because those who are interested in child pornography generally maintain and cultivate their collections, the Eighth Circuit has consistently held that "evidence developed within several months of an application for a search warrant for a child pornography collection and related evidence is not stale." Estey , 595 F.3d at 840 (five months); see also United States v. Lemon , 590 F.3d 612, 615-16 (8th Cir. 2010) (18 months); United States v. Horn , 187 F.3d 781, 786-87 (8th Cir. 1999) (three or four months). Indeed, the Eighth Circuit has upheld warrants executed years after the discovery of evidence of child pornography. See, e.g., Notman , 831 F.3d at 1088 (several years); see also United States v. Morales-Aldahondo , 524 F.3d 115, 119 (1st Cir. 2008) (three years).
Judges are supposed to use common sense in assessing whether probable cause exists at the time that a warrant is sought. Donnelly , 475 F.3d at 954. Given that both Omegle and NCMEC were attempting to assist law enforcement in apprehending someone who had streamed child pornography during a video chat, common sense would suggest that the period of time between the video chat and the search-warrant application did not exceed the capacious time frames approved by the Eighth Circuit in child-pornography cases. Moreover, the Eighth Circuit has upheld search warrants for child pornography based on supporting affidavits containing no dates whatsoever when it was reasonable to conclude that evidence would be discovered *847 because of the suspect's demonstrated interest in child pornography. See, e.g., United States v. Summage , 481 F.3d 1075, 1078 (8th Cir. 2007) ("Thus, the affidavit's failure to include the date of that encounter is not fatal to a determination that probable cause existed ...."); see also United States v. Granley , No. 16-CR-0196 (ADM/LIB), 2016 WL 11186990, at *9 (D. Minn. Nov. 2, 2016) (holding that an affidavit supplied probable cause even though it did not "contain the dates of the reports or the dates of the occurrences described therein").
Manning argues that Judge Oleisky had no basis for concluding that Manning had a demonstrated interest in child pornography. The Court disagrees. Agent Johnson's affidavit provided evidence that Manning had either (1) livestreamed the sexual abuse of a young child by an adult woman or (2) streamed a pre-recorded video depicting such abuse. Surely a judge can reasonably infer that a man who would stream a depiction of the sexual molestation of a child to a stranger that he recently met through Omegle would have at least as much interest in collecting child pornography as someone who had downloaded child pornography from the Internet or sought child pornography in a chat room. See United States v. Colbert , 605 F.3d 573, 578 (8th Cir. 2010) ("There is an intuitive relationship between acts such as child molestation or enticement and possession of child pornography. Child pornography is in many cases simply an electronic record of child molestation. Computers and internet connections have been characterized ... as tools of the trade for those who sexually prey on children."); United States v. Lemon , No. 08-CR-0246 (DSD/SRN), 2008 WL 4999235, at *2 (D. Minn. Nov. 19, 2008) ("Individuals who seek sexual gratification involving children often store images of child pornography on their computers, often for months or years.").
Agent Johnson's expert testimony further bolstered the conclusion that Manning had an ongoing interest in child pornography. Courts consider "[t]he source" and "credibility" of the evidence supporting a search warrant. United States v. Humphrey , 140 F.3d 762, 764 (8th Cir. 1998). Qualified law-enforcement testimony "about the extent to which pedophiles retain child pornography" should be given "substantial weight" in probable-cause determinations. Lemon , 590 F.3d at 615. Agent Johnson-drawing on her 13 years' experience investigating crimes against children and crimes related to predatory offenders-testified in her affidavit that "individuals who are sexually attracted to children tend to have images and or videos of children engaged in sexually-explicit conduct" stored on electronic devices in their homes. ECF No. 33-1 at 8-9. She further testified that collectors "often retain these images for the purpose of reliving the incident" and "maintain them for several years." ECF No. 33-1 at 8. Viewing the evidence of Manning's conduct through the lens of her expertise about the tendencies of child predators, Agent Johnson predicted that child pornography would be found at Manning's residence.
For these reasons, the Court finds that Judge Oleisky had a substantial basis for finding that Agent Johnson's affidavit established probable cause to search Manning's residence and belongings.[4]
*848 B. Motion to Suppress Statements
Manning also seeks suppression of statements that he made to Agent Johnson while his house was being searched. Both parties agree that Agent Johnson interrogated Manning without first providing Miranda warnings. Thus, "[t]he critical question is whether the interrogation occurred in a custodial setting." United States v. Jones , 630 F.2d 613, 615 (8th Cir. 1980).
A suspect is in custody when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Czichray , 378 F.3d 822, 826 (8th Cir. 2004) (quoting California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) ). "To determine whether a suspect was in custody," the Court asks "whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." United States v. Laurita , 821 F.3d 1020, 1024 (8th Cir. 2016) (citation omitted).
The Eighth Circuit has identified six non-exclusive indicia of custody. These indicia include:
(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and] (6) whether the suspect was placed under arrest at the termination of the questioning.
Id. The presence of any of the first three "mitigating" factors weighs against finding custody whereas the presence of the last three "aggravating" factors supports a custody determination. See id. at 1024-25. Although these factors are helpful, custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Czichray , 378 F.3d at 827.
The presence of the first mitigating factor strongly weighs against finding that Manning was in custody. "That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." Id. at 826. "So powerful ... that no governing precedent of the Supreme Court or [the Eighth Circuit] ... holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." United States v. Giboney , 863 F.3d 1022, 1028 (8th Cir. 2017) (citation omitted). Agent Johnson began her questioning by telling Manning that he was neither "under arrest" nor "in custody." Gov't Ex. 1A at 2. Manning confirmed that he understood Agent Johnson's admonitions by responding "[o]kay" and "[y]eah." Gov't Ex. 1A at 2; see Giboney , 863 F.3d at 1028 (explaining that the defendant "confirmed his understanding" that he was not in custody by responding "Ok" and "That's fine"). Then, Agent Johnson told Manning that he could tell her to "pound sand" or tell her that he *849 was "never gonna talk." Gov't Ex. 1A at 2. These statements conveyed that Manning could terminate the questioning and leave.
Likewise, the presence of the third mitigating factor weighs against finding that Manning was in custody. Agent Johnson "asked Mr. Manning if he would speak to [her] in a separate room." ECF No. 42 at 16. Manning agreed to talk, and-without any handcuffs or other coercion-accompanied Agent Johnson to a room where they could speak. See ECF No. 42 at 16, 18-19. At the beginning of questioning, Manning indicated his desire to truthfully answer Agent Johnson's questions. See Gov't Ex. 1A at 2. Manning further demonstrated "voluntary acquiescence" by cooperating with law enforcement during the execution of the search warrant. Manning identified which computers belonged to him, told law enforcement which computers he used and which ones his father used (Manning lived with his father), shared the WiFi password and the desktop computer password, and disclosed his email addresses. Gov't Ex. 1A at 6-10; See United States v. Axsom , 289 F.3d 496, 502 (8th Cir. 2002) (stating that the defendant's "extremely friendly and cooperative" conduct during the interview "supports a finding of voluntary acquiescence"). Taken together, Manning's cooperation and willingness to provide truthful answers to the officers' questions amount to voluntary acquiescence.[5]
At least two of the three aggravating factors are not present in this case. The BCA did not arrest Manning after the interrogation concluded. And nothing suggests that the BCA used strong-arm tactics or deceptive stratagems.[6] As to the final aggravating factor: Manning argues that the atmosphere was police dominated. Agent Johnson testified that about nine officers came to Manning's residence to execute the search warrant. ECF No. 42 at 27. During interrogation, Agent Johnson sat next to Manning on the arm of a love seat while another officer sat on a chair between Manning and the (closed) door to the (small) room. See ECF No. 42 at 21-22, 32-34. Agent Johnson directed Manning to remain seated during questioning even though he told her that he wanted to stand. ECF No. 42 at 33.
The Court agrees that the atmosphere was somewhat police dominated-although not as police dominated as, say, questioning at a police station or in the back of a moving squad car. See Axsom , 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."). But the presence of this aggravating factor is not sufficient to create custody because "[a]ny warrant search is inherently police dominated," United States v. Perrin , 659 F.3d 718, 721 (8th Cir. 2011), and the Eighth *850 Circuit has "refused to find custody in circumstances where the atmosphere was much more police dominated" than here, Giboney , 863 F.3d at 1028 (collecting cases).
Taking into account "the totality of the circumstances," the Court finds that a reasonable person in Manning's position "would have felt at liberty to terminate the interrogation and leave." Laurita , 821 F.3d at 1024. Thus, Manning was not in custody, and the law-enforcement officers who questioned him were not required to provide Miranda warnings. Manning's motion to suppress the statements that he made to Agent Johnson is accordingly denied.
ORDER
Based on the foregoing, and on all of the files, records, and proceedings herein, the Court OVERRULES Manning's objection [ECF No. 56] and ADOPTS the November 1, 2018 R&R [ECF No. 55] to the extent that it is consistent with this order. IT IS HEREBY ORDERED THAT:
1. Manning's motion to suppress statements [ECF No. 22] is DENIED.
2. Manning's motion to suppress evidence [ECF No. 26] is DENIED.
REPORT AND RECOMMENDATION
DAVID T. SCHULTZ, United States Magistrate Judge
INTRODUCTION
Defendant Ryan Manning was indicted and charged with possession and production and attempted production of child pornography in violation of 18 U.S.C. §§ 2251(a) and (e), 2252(a)(4)(B) and (b)(2). Indictment, Docket No. 1. Manning moves to suppress evidence seized as a result of a search warrant that he alleges lacked probable cause. Motion, Docket No. 26. He also moves to suppress statements made to law enforcement during an interrogation at his home on December 16, 2016 while the search warrant was being executed, alleging that it was a custodial interrogation and the Government failed to advise him of his constitutional rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Motion, Docket No. 22. For the reasons stated below, the Court recommends that Manning's motions to suppress be denied.
1. SEARCH WARRANT
A. Findings of Fact
A search warrant was issued on December 15, 2016 by Judge Allen Oleisky of Hennepin County District Court of the State of Minnesota. Search Warrant at 1-3, Docket No. 33-1. It was requested by Special Agent ("SA") Dawn Johnson, a police officer with the Minnesota Bureau of Criminal Apprehension ("BCA") who was assigned to the BCA's Predatory Crimes Section. Application and Affidavit at 1-4, Docket No. 33-1.
The warrant authorized a search of Manning's person, certain identified vehicles, and his residence in Bloomington, Minnesota, for property and things including computer systems; media; digital camera or video equipment and videotapes; electronic devices and data storage media; data contained on hard drives or removable media that may show the production, possession or distribution of child pornography; chat line logs; papers and effects that tend to show the possession or distribution of child pornography; visual depictions of minors of a sexual nature; programs and manuals for operating systems or applications; notes and documentation relating to passwords, victim's names, or websites; proof of residency and information showing ownership, possession and use of computers and electronic devices; a high definition webcam; and specific clothing and bedding determined to match a snapshot image from an Omegle website chat session. Warrant, Docket No. 33-1.
*851 SA Johnson's affidavit states that in August 2016, the BCA Internet Crimes Against Children ("ICAC") Task Force received CyberTip Report # 13208593 from the National Center for Missing and Exploited Children ("NCMEC"). Application at 1-4, Docket No. 33-1. NCMEC had received the CyberTip from the electronic service provider ("ESP") Omegle, an online chat website that randomly pairs users in one-on-one anonymous chat sessions ("chat roulette") using webcams and microphones. Id. at 1-4 to 1-5.
Omegle's chat system automatically captures snapshots (still images) from users' webcam video streams. Id. at 1-5. These snapshots are reviewed by Omegle's Moderation Team. Id. When a moderator flags a snapshot as containing apparent child pornography, Omegle reports it to the CyberTipline. Id. Multiple files may be attached in a CyberTip report, and each file may contain multiple snapshots. Id. If a CyberTip report contains multiple files, the first file is the one that was specifically flagged for apparent child pornography. Id.
Omegle's CyberTip provided 12 uploaded files containing snapshots of video streams and reported the user as:
ESP User ID: YS7SG2SL
IP Address: 50.188.79.76 (Upload)
07-19-2016 00:33:35 UTC
Id. at 1-4.
The first file from CyberTip # 13208593 was the one specifically flagged for apparent child pornography. Id. at 1-5. The remaining 11 files were captured from the same webcam and the same IP address during other chat sessions; these files were present in the moderation system at the time the first file was flagged. Id.
SA Johnson viewed the 12 files. Her affidavit describes in detail the image she observed in the first file which showed an adult female engaged in sexual contact with a child approximately 3-5 years old. Id. The other 11 files contained snapshots of a white male in his 20s wearing a particular t-shirt. Id. His nose, mouth and chest are visible in the snapshots but not his eyes. Id. The IP address from the CyberTip matched the IP address of a Comcast subscriber at Manning's home address. Id. at 1-6. Tax and property records showed that Manning was associated with the subscriber's home address. Id. SA Johnson researched driver's license and vehicle records and found that the address listed on Manning's license matched the Comcast subscriber address and that vehicles registered to him listed the same address. Id. at 1-6. She looked at past and present Department of Motor Vehicle photos of Manning, compared them to the snapshots of the white male in the Omegle files, and was confident that he is the person in the snapshots. Id. In early December 2016, SA Johnson and other officers surveilled the address and observed the vehicles and a male in his 20s fitting Manning's description. Id. at 1-7.
SA Johnson's affidavit also explained her training, experience and knowledge regarding use of the Internet by persons with an interest in child pornography; the availability of anonymous Internet tools, services and websites to gain easy access to child pornography; the use of computers, other electronic devices and "the cloud" to store images or videos of child pornography; and the propensity of persons interested in child pornography to collect and store such images in safe, secure and private environments such as computers, other devices and surrounding areas in their homes or on their person in order to easily view the images, and to maintain their collections for extended periods of time, often for many years. Id. at 1-7 to 1-8.
The search warrant was issued on December 15 and was executed at Manning's home on December 16, 2016.
*852 B. Conclusions of Law
Courts examine the "totality of the circumstances" to determine whether an affidavit provides probable cause to issue a search warrant. Illinois v. Gates , 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The task of the judge issuing the warrant is "to make a practical, common-sense decision, given all the circumstances set forth in the affidavit," whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Id. A reviewing court's role is "simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." Id. at 238-39, 103 S.Ct. 2317 (quotations and citations omitted).
Manning contends that SA Johnson's affidavit is insufficient to establish probable cause because the information is stale and uncorroborated. See Manning Br. 6, Docket No. 48. He acknowledges there is no bright-line test for determining when information is stale, see United States v. Johnson , 848 F.3d 872, 877 (8th Cir. 2017), and that federal courts have recognized that, in child pornography investigations, information may be deemed not stale despite the passage of months or even years before the issuance of a warrant, due to the well-known habits of people possessing child pornography to collect or hoard such images in a secure, private environment such as computers or other electronic or digital media in their homes, see United States v. Notman , 831 F.3d 1084, 1088 (8th Cir. 2016). However, Manning contends that here the information in the affidavit is "per se stale" because it identified only a single image of child pornography and does not state the date on which the alleged criminal violation occurred. Manning Br. 12, Docket No. 48. He further asserts that, when there is only a single image or incident of child pornography, there must be some independent corroborating evidence of the person's interest in child pornography or of his propensity to possess or retain such images, in order to support an inference that there is a fair probability that a search of his home would result in the discovery of child pornography. Id. at 10-11. He states that traditionally that such corroboration might include a subscription to a child pornography website, use of a peer-to-peer file sharing system to download and share child pornography files, or maintaining an Internet account and username that is connected to child pornography. Id. at 15, 18.
First, the Court does not find the Omegle CyberTip per se stale based on the affidavit's lack of detail regarding the July 19, 2016 date. CyberTip # 13208593 reported the user and IP address to NCMEC and included the date July 19, 2016. Application at 1-4, Docket No. 33-1. The affidavit does not specify whether that is the date of the user's chat session during which Omegle captured the image from the video stream, the date on which the Omegle Moderation Team flagged the snapshot, or the date on which it forwarded the CyberTip to NCMEC - or whether all three of these things occurred on that same date. While it would have been clearer to have a specific explanation for the July 19, 2016 date,[1] the Court does not find that the absence of additional detail makes the information per se stale, as Manning urges. He cites no Eighth Circuit precedent to support his argument for a per se *853 rule, citing only a First Circuit case that the Court finds inapposite and unpersuasive in the present circumstances. See Rosencranz v. United States , 356 F.2d 310, 315-16 (1st Cir. 1966) (conviction for illegal operation of a still overturned because warrant failed to state when the anonymous informant smelled the distinctive odor of mash outside the premises, or when the affiant received the information from the informant).
Second, because there is no bright-line test to determine when information in a warrant is stale, courts "look to the circumstances of the case, including the nature of the crime involved." United States v. Lemon , 590 F.3d 612, 614 (8th Cir. 2010) (quotations and citations omitted). "The lapse in time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." Id. Here, the "nature of the crime" is child pornography, and the Eighth Circuit has recognized that "[p]ossession of child pornography is a crime that is continuing in nature." Id. ; see also Johnson , 848 F.3d at 878. The caselaw also recognizes the "compulsive nature of the crime of possession of child pornography and the well-established hoarding habits of child pornography collectors." See Notman , 831 F.3d at 1088.
Manning argues, however, that the recognized propensity-to-collect characteristic does not apply here because the affidavit was based on a CyberTip containing a single intercepted image of child pornography and had no independent corroborating evidence tending to show that he would collect and store images in his home. The Court recognizes that the cases Manning cites have described traditional indicia of sexual interest in children and a predisposition to collect child pornography, but that is at least in part because those cases have largely involved more traditional technologies and modes of possessing, sharing and/or distributing child pornography. See, e.g. , United States v. Frechette , 583 F.3d 374, 376-77 (6th Cir. 2009) (subscription to child pornography website using PayPal account in his own name, address and phone); United States v. Pappas , 592 F.3d 799, 802 (7th Cir. 2010) (images of child pornography sent to email account); United States v. Vosburgh , 602 F.3d 512, 516-17 (3d Cir. 2010) (Ranchi underground Internet message board exclusively dedicated to child pornography in which access to content is via gateways involving passwords, decryption, and downloads). Manning argues, in essence, that at most the affidavit links Manning to an image of child pornography that existed in cyberspace and - absent other corroborating evidence of an interest in child pornography that could support an inference of a propensity to collect and retain such images - there was insufficient basis to believe a search of his home would uncover child pornography.
The Court concludes, however, that one cannot take words or phrases in isolation from those other cases without accounting for the setting and the evolution of technology in a forum such as Omegle that is specifically designed to be free of traditional indicia such as registrations, passwords, accounts, subscriptions to child-porn-only services, or similar records, and is designed to make random pairings of individuals in chat sessions. This Court is persuaded that the signing magistrate could reasonably infer from the totality of the circumstances - including the unique characteristics of the technology (a "chat roulette") and the nature of the medium (a video stream), as well as the image captured - that Manning was affirmatively interested in child pornography.[2] Even *854 though Omegle is not intended or used exclusively for purposes related to child pornography, this fact alone does not defeat the inference. From this inference, the signing judge could reasonably conclude that the person linked to the snapshot depicting child pornography captured by Omegle's Moderation Team from the video stream of his chat session, may have saved that image on his home-based computers or devices, or collected and stored other depictions of child pornography in his home or on mobile devices on his person or in his vehicles. Manning has cited no Eighth Circuit precedent involving this technology and circumstances that would deem the reference to the hoarding habits of persons interested in child pornography was so unwarranted as to mandate suppression of the evidence.
The circumstances here are also distinguishable from cases cited by Manning in which the affidavits established no link at all to support a warrant to search for child pornography in the person's home. In Zimmerman , one alleged child victim of molestation stated that the perpetrator showed him one video clip of adult pornography, but there was no mention of any child pornography. United States v. Zimmerman , 277 F.3d 426, 430 (3d Cir. 2002). Therefore, there was no probable cause to search the home for child pornography. Id. at 432-33. Zimmerman recognized the "expert opinion ... that collectors of child pornography rarely if ever dispose of such material and store it for long periods in a secure place, typically in their homes"; however, the Zimmerman court stated that "nothing indicates that this logic applies in the adult pornography context." Id. at 435.
In Doyle , "none of the alleged child victims [of molestation] made allegations to law enforcement that they were shown pornographic material" and, in fact, there was "no indication" they were "even asked during the interview process about the presence of child pornography." United States v. Doyle , 650 F.3d 460, 473 (4th Cir. 2011). Although one relative of a child mentioned photographs depicting "nude children," no one followed up to "at least obtain a description of the photographs" to determine whether they contained a "lewd exhibition of nudity" in violation of state law. Id. Consequently, the court concluded there was no probable cause to search for child pornography. Id. at 472.
In contrast to Zimmerman and Doyle , Manning was linked to the image of child pornography in the CyberTip by an IP address that matched Manning's home address and chat sessions from the same IP address in the Omegle system that showed a white male in his 20s that fit his physical description, after being matched by SA Johnson's review of past and present driver's license photos and by physical surveillance of him outside his home.
Finally, the Court finds the decision in United States v. Raymonda , 780 F.3d 105 (2d Cir. 2015), unpersuasive, as Raymonda involved different technology and circumstances than are present in this case. Moreover, the Court is unaware of any decision in the Eighth Circuit or in this *855 district citing Raymonda , let alone analyzing or adopting it.
The Court concludes that the totality of the circumstances set forth in the affidavit provided a substantial basis for the judge issuing the warrant to conclude that probable cause existed to believe that a search of Manning's residence would result in evidence of a crime.
Even if the search warrant were not supported by probable cause, Manning's motion to suppress should be denied under the good-faith exception of United States v. Leon , 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Under Leon , evidence will not be suppressed when it was seized in reasonable, good-faith reliance on a facially valid search warrant that is later found to be invalid. A warrant issued by a magistrate normally suffices to establish that a law enforcement officer acted in good faith in conducting the search. Leon , 468 U.S. at 922, 104 S.Ct. 3405. However, an officer's reliance on a warrant is objectively unreasonable:
(1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that the executing officer could not reasonably presume the warrant to be valid.
United States v. Grant , 490 F.3d 627, 632 (8th Cir. 2007) (quotations and citations omitted).
Manning contends that the third Leon exception applies because the affidavit "rel[ied] on mere speculation," was so "bare-bones" and "boilerplate" and "contained so few indicia of probable cause" that no reasonable officer would have relied on the issuing judge's determination of probable cause. See Manning Br. 20-21, Docket No. 48. The Court disagrees. For the reasons discussed above with respect to SA Johnson's affidavit, the Court finds that the warrant here was not based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," see Grant , 490 F.3d at 632. The officers executing the search warrant thus acted in reasonable reliance on it.
The Court finds there was sufficient evidence in the affidavit to support a finding of probable cause that child pornography would be found in Manning's home. The Court also finds that, even if the warrant was not supported by probable cause, it was objectively reasonable for the executing officers to rely on it, and therefore the good-faith exception of Leon applies. Accordingly, the Court recommends that Manning's motion to suppress the search warrant be denied.
2. INTERROGATION
Manning moves to suppress statements he made to law enforcement on December 16, 2016 during an interview that took place in his home while officers were executing the search warrant. Motion, Docket No. 22.
A. Findings of Fact
On December 16, 2016 two officers intercepted Manning as he left his house to get in his truck. Hrg Tr. 15, Docket No. 42. It was a very cold day, about 20 degrees or colder outside. Id. at 15, 31. They told him they had a warrant to search him, his vehicle, and his house, and they escorted him back to the house. Id. at 30. The officers were armed and wearing bullet-proof vests. Id. There may have been up to ten law enforcement vehicles on the scene, *856 as each BCA agent, officer and detective arrived in his or her own vehicle. Id. at 32. It is not clear how many officers executed the warrant inside and outside the house, but it could have been "around eight officers" in addition to SA Johnson and Detective Heather Potter, who were in the room with Manning during the interview.
SA Johnson conducted the interview in a small guest room of Manning's home. Gov't Ex. 1A,[3] at 1; Hrg Tr. 20, Docket No. 42. The room was chosen in part because it was a room that did not contain any weapons. Hrg Tr. 18, 20, Docket No. 42. It measured approximately 8-10 feet by 8-10 feet. Id. at 21. Manning and SA Johnson sat on a love seat type couch, with SA Johnson sitting on the arm rest of the couch. Id. at 21, 33. A chair was brought in for Det. Potter to sit on. Id. at 21. Det. Potter's chair was PLACED about three feet in front of the door, which was shut but not locked. Id. at 21-22, 33. There was room to open and close the door, although Manning would have had to veer a bit around Det. Potter to reach the door. Id. at 33-34.
SA Johnson told Manning he was not under arrest and that she had "zero intention" of taking him from the house that day. Gov't Ex. 1A, at 2. She stated:
DJ: Well I just want it to be clear that ... I'm not reading you your rights. You know you're not in custody. Um, if you said pound sand see ya later, and I'm never gonna talk to you, you can do that. You can do that. We still have to secure the scene ....
RM: Yeah.
DJ: ... and we wouldn't want you just (inaudible) leave with your truck. You know you'd be ...
RM: Okay.
DJ: ... out in the cold I guess you're dressed for it but but the point is that I don't wantcha to think this is done and over and and you're goin' somewhere right now. Okay?
Id.
At one point, without prompting by SA Johnson, Manning raised the issue that he needed to "figure out how t[o] let my foreman know so I don't do no call, no show." Id. at 18. Manning's own phone was used to allow him to speak with his boss to tell him he would not make it to work that day. Id. at 21-22.
The interview lasted approximately 50 minutes. Gov't Ex. 1.
B. Conclusions of Law
Manning does not dispute that, at the outset of the interview, SA Johnson told him he was free to leave, was not under arrest, and did not have to talk to her at all, and that at the end of the interview he was not in fact arrested. He contends, however, that the circumstances surrounding the interview, viewed in totality, establish that his freedom of movement was restricted to such an extent that a reasonable person would not have felt free to end the interrogation and leave. Therefore, he argues, he was in custody during the interview and the Government was required to advise him of his constitutional rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because he was not given a Miranda warning, he moves to suppress the statements he made during the interview.
Even when a person is not placed under arrest, the police must give a Miranda warning when his freedom of movement is *857 restrained to a degree associated with a formal arrest. Stansbury v. California , 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). A court looks at the totality of the circumstances and makes a determination based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id. at 322-23, 114 S.Ct. 1526. The court determines whether, under the particular circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane , 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).
The Court finds that neither SA Johnson's conduct and statements, nor any other circumstances surrounding the interview, had the effect of undermining her advisory to Manning that he was not in custody or under arrest and that he did not have to talk to her at all. The context of her statement that she did not want Manning to think he was "going somewhere right now" refers to her immediately preceding statement that he was not being placed under arrest and taken from the house. She did not say or suggest that he would have to miss work so that they could question him; rather, after she asked him where he worked, what kinds of activities he engaged in, where he traveled, and about various computers in the house, Manning himself raised the issue of how to let his workplace know that he would not be a "no-show" at his work assignment that day.
SA Johnson's position on the arm rest rather than seated right next to Manning on the couch is not so overbearing as to be oppressive or intimidating, especially in light of the calm, conversational tone of the interview. Moreover, the positioning of SA Johnson and of Det. Potter in the chair did not as a practical matter restrict him from moving from the couch or exiting the room, and a reasonable person would not have concluded that they were blocking his exit. Det. Potter's position three feet in front of the door, somewhat off to the side, is not the position of a sentry guarding the door to prevent his exit.
The fact that Manning's vehicle was not available to him is attributable to the scope of the warrant, which included several vehicles registered to him. It is also true that there was a large law enforcement presence at his home. Armed officers intercepted him in his vehicle as he was leaving for work and took him back to his house, and several officers and/or BCA agents searched the house and vehicles. This is a consequence of the scope of the warrant and the property and things to be searched and/or seized. However, the atmosphere overall, including in the room in which the interview took place, was not so police-dominated as to create a custodial setting and overcome SA Johnson's statements to him that he was not under arrest, was free to leave, and did not have to talk to her. Therefore, the interrogation was non-custodial; the statements Manning made were voluntary and need not be suppressed.
RECOMMENDATION
IT IS HEREBY RECOMMENDED that:
1. Defendant Ryan Manning's Motion to Suppress Statements [Docket No. 22] be DENIED.
2. Defendant Ryan Manning's Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure [Docket No. 26] be DENIED.
Dated: November 1, 2018

At the motions hearing before Judge Schultz, the government entered into evidence an audio recording of the interview with Manning (Exhibit 1) and a transcript of that recording (Exhibit 1A). See ECF No. 42 at 10-11.

Judge Schultz held that Judge Oleisky could infer from "the unique characteristics of the technology," "the nature of the medium," and "the image captured" that Manning had an affirmative interest in child pornography. ECF No. 55 at ---- - ----. Judge Schultz reached this conclusion notwithstanding his expressed uncertainty about whether Manning merely viewed the child pornography. To be clear: This Court does not believe that probable cause would have existed if Agent Johnson's affidavit merely provided evidence that Manning may have viewed a single child-pornography video during a single Omegle video chat. But, as the Court has explained, Agent Johnson's affidavit provided evidence that Manning had streamed child pornography from his home-which, in turn, provided probable cause that child pornography would be found in his home.

Manning argues that, even if there was evidence that he streamed an image of child pornography, the fact that he streamed a single image cannot support an inference that he was "a collector who would have child pornography at his residence." ECF No. 48 at 17. The Court disagrees. As the Eighth Circuit has held, probable cause to search a suspect's residence can be established even when law enforcement intercepts only one image of child pornography. See, e.g., United States v. McArthur , 573 F.3d 608 (8th Cir. 2009) (finding probable cause to issue a search warrant when law enforcement discovered a single laminated photograph of a nude child in the defendant's wallet); see also United States v. Needham , No. 13-CR-0111 (JRT/LIB), 2013 WL 4519414, at *9 (D. Minn. Aug. 26, 2013) ("[T]he Eighth Circuit has held that a single image of child pornography can suffice to provide probable cause to search a suspect's computer.").

The R&R concludes that, even if the search violated the Fourth Amendment, the evidence should not be suppressed because of the good-faith exception to the exclusionary rule established by United States v. Leon , 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). ECF No. 55 at ---- - ----. Manning argues that the good-faith exception does not apply because the affidavit in support of the warrant was so bare-bones and speculative that no official could reasonably believe probable cause existed. ECF No. 48 at 20-24. For the reasons explained above, the Court disagrees with Manning and agrees with Judge Schultz that the good-faith exception would apply. After all, three judges-a federal district judge, a federal magistrate judge, and a state trial judge-have now reviewed the affidavit and found that it provided probable cause to search Manning's home.

Manning argues that the third mitigating factor is actually absent because he did not initiate contact with the BCA. ECF No. 47 at 14. Manning makes the same mistake that the Eighth Circuit cautioned against in United States v. Axsom , 289 F.3d 496, 501 (8th Cir. 2002). The third mitigating factor is stated in the disjunctive: "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions." Laurita , 821 F.3d at 1024 (emphasis added). Manning did not initiate contact with the BCA, but he did voluntarily answer questions, and thus the third mitigating factor is present. See Axsom , 289 F.3d at 501.

Manning argues that Agent Johnson used deceptive tactics by assuming that Manning was guilty and minimizing the moral seriousness of his offense. See ECF No. 47 at 15-17. The Court disagrees. "[N]o one menaced or tricked" Manning into making incriminating statements. United States v. Bordeaux , 400 F.3d 548, 560 (8th Cir. 2005). Instead, Agent Johnson used "permissible small talk and rapport-building techniques to make [the defendant] more comfortable with the difficult subject matter and to gain [the defendant's] trust and goodwill." United States v. Plumman , 409 F.3d 919, 924 (8th Cir. 2005).

The Government's brief states that July 19, 2016 was the date of the Omegle chat session that involved the snapshot depicting child pornography and also the date of Omegle's CyberTip to NCMEC. Gov't Br. 2, Docket No. 54. However, that specific explanation does not appear in the four corners of the warrant.

The warrant application is not a model of specificity, a fact which hampers this Court's consideration of the issues presented. For example, the affiant does not clarify whether the association of the image to Manning's IP address indicates that he was transmitting the video at issue or merely viewing it. If the association indicates that Manning was transmitting the video (as opposed to merely viewing it) the issue of probable cause is far easier. (Mere viewing, after all, could be inadvertent). If the affidavit specified the duration of the chat session, that fact might also bear on the question of inadvertence. Moreover, the affidavit does not explain how often snapshots are captured form users' chat sessions and how long Omegle stores them. Both details would help explain whether the absence of other child pornography snapshots associated with Manning's IP address is significant.

Gov't Ex. 1A is a transcript made from a CD (Govt' Ex. 1) of the audio recording of the interview. The transcript is "imperfect but helpful" to assist a person listening to the audio recording. Both exhibits were received into evidence at the hearing on August 13, 2018. Hrg Tr. 10-11, Docket No. 42.